STATE OF VERMONT
SUPERIOR COURT – ENVIRONMENTAL DIVISION

|                          | {   |                                      |
|--------------------------|-----|--------------------------------------|
|                          | {   | **Docket No. 119-7-10 Vtec**         |
| **In re Berger & Katz**  | {   | **(Appeal from App. #MS-10-04 decision)** |
| **Expansion Applications** | { | **Docket No. 141-9-11 Vtec**         |
|                          | {   | **(Appeal from App. #MS-11-01 decision)** |
|                          | {   |                                      |

## Decision on the Merits

Claudia Berger and Sheldon Katz ("Applicants") sought approval from the City of South Burlington Development Review Board ("the DRB") to construct five improvements to their single-family dwelling located at 54 Central Avenue in the City of South Burlington, Vermont ("the City"). As detailed in the procedural overview contained in our May 30, 2012 decision on the then-pending cross motions for summary judgment,[1] Applicants first sought approval for their proposed improvements in 2010 (Application No. MS-10-04) and, when not satisfied with the DRB's determination, appealed to this Court; this first appeal was assigned Docket No. 119-7-10 Vtec. After the Court suggested in its February 4, 2011 decision[2] on pre-trial motions that Applicants may wish to modify their application, Applicants submitted a second application to the DRB, which was docketed by the DRB as Application No. MS-11-01. When Applicants were aggrieved by the DRB's decision on their second application, Applicants filed a second appeal with this Court, which was assigned Docket No. 141-9-11 Vtec.

Applicants' two applications seek approval for the same five improvements to their principal residence property. The two applications differ only slightly in the relationship of some of the proposed improvements to the property's northern boundary and the setback from that boundary. When Applicants gave notice that they wished to seek approval before this Court for each of their applications as alternative designs, the Court coordinated the matters for trial, pursuant to V.R.E.C.P. 2(b).

The Court conducted a two-day trial, commencing on June 12, 2012 and concluding on June 13, 2012. The Court previously completed a site visit with the parties, all of whom were present and assisted at both the site visit and trial by their attorneys: Sheldon Katz, Esq.,

---

[1] In re Berger & Katz Application, Nos. 119-7-10 Vtec & 141-9-11 Vtec, slip op. at 1–3 (Vt. Super. Ct. Envtl. Div. May 30, 2012) (Durkin, J.).

[2] In re Berger & Katz Application, No. 119-7-10 Vtec (Vt. Super. Ct. Envtl. Div. Feb. 4, 2011) (Wright, J.).

representing himself,[3] and John H. Klesch, Esq., representing the City. Neighbor Bruce H. Alvarez appears in these proceedings as an interested person, representing himself.

Based upon the credible testimony and other evidence presented at trial, including that evidence put into context by the site visit that the Court conducted with the parties, the Court renders the following Findings of Fact, Conclusions of Law, and Judgment Order that accompanies this Merits Decision.

## Findings of Fact

### I. Applicants' Property.

1. Applicants occupy as their principal residence the previously-improved property that they own at 54 Central Avenue in the City. Their property is located in the Queen City Park Zoning District ("QCP District"). Immediately north of Applicants' property is the principal residence property of Bruce H. Alvarez ("Neighbor") and his family. Mr. Alvarez participated in the site visit and presented evidence at trial.

2. The existing building on Applicants' property includes a single family residence with a rear deck and a front porch that has recently been used for firewood storage. The rear deck has an approximately eight-foot high privacy wall on its northern edge, facing Neighbor's property. The footprints of the existing building, rear deck, and front porch are depicted on a survey plat admitted at trial as Applicants' Exhibit 4.

3. The northwestern corner of Applicants' existing front porch is approximately four feet from their property's northern boundary line. The northeastern corner of their existing rear deck is less than three feet from the northern boundary line.

4. Applicants' lot existed prior to February 28, 1974.

5. Applicants seek to complete the following improvements to their property:

   1) Enclose or replace an existing front porch with an addition of the exact same dimensions and incorporate the new space into their home's interior living space;

   2) Replace a rear deck with an enclosed two-story addition to their home's interior living space;

   3) Construct a new front porch, measuring six feet by ten feet, with a roof covering it;

---

[3] Co-Applicant Claudia Berger was not present at the site visit or trial. She was represented in both instances by her Co-Applicant, Sheldon Katz, who is a Vermont-licensed attorney.

4) Attach a new screened rear deck with a roof to the southeastern section of the existing residence, with an interior ceiling of not more than nine feet when measured from the interior floor of the residence;[4] and

5) Add two dormers on the front and rear sides of the southern portion of the dwelling roof, so as to expand the living area in the adjoining second-floor rooms.

6. Applicants' proposed improvements do not impact upon the existing garage and exterior parking areas on their property, which are sufficient for their use of the property as a single family residence.

7. The proposed expansion of the interior space that will replace the existing rear deck will rise two stories and have a roof that will be pitched in a manner that aligns with the pitched roof of the existing structure. None of the proposed improvements will exceed a height of 25 feet, measured from the midpoint of the pitched portion of any new roof.

8. Applicants' proposed improvements will increase the square footage of the interior space of their home.

9. Applicants' property is less than 5,000 square feet in total surface area. With the proposed structural additions to Applicants' residence, the improved home will not cover more than forty percent of their lot. When the property's parking area is added to the footprint of the improved building, the total impervious surfaces will not exceed sixty percent of total lot coverage.

10. Applicants' proposed improvements will not cause a change in the use of their property as a principal residence.

11. Applicants propose several variations to the exact footprint that their new interior space additions will occupy in replacement of the existing front porch and rear deck. The first proposal in their first application (DRB Application No. MS-10-04) was to have their additions mirror the exact footprint of their existing front porch and rear deck, thereby aligning with the northern exterior wall of their existing dwelling. See Exhibit 7. During the proceedings concerning their first application, Applicants agreed to revise their site plan, as suggested by Town officials, to show that their proposed new structures would respect the five-foot minimum setback from their northern boundary line.

---

[4] Applicants did not provide the specific dimensions for their proposed new rear deck, other than to represent that its exterior limits would align with the southern wall of their existing residence and the eastern wall of their proposed rear addition.

12. After the then-presiding judge determined that Applicants could not present their desired site plan to the Court in the appeal docketed as No. 119-7-10 Vtec, since the DRB had not considered that application,[5] Applicants consented to the Court placing Docket No. 119-7-10 Vtec on inactive status while they submitted their original site plan to the DRB. When the DRB did not approve their second application as proposed (DRB Application No. MS-11-01), Applicants appealed that second determination to this Court; their second appeal was assigned Docket No. 141-9-11 Vtec.

13. Applicants would prefer to construct the replacement additions for their existing front porch and rear deck so that they align with their existing residential structure, as depicted on Applicants' Exhibit 7. As depicted on Exhibit 7, this plan would result in the northeastern corner of the new addition to the rear of Applicants' residence being less than three feet from their northern boundary line; the northwestern corner of the new addition in front of Applicants' residence would be about four feet from their northern boundary line.

14. If their preferred design does not meet with the Court's approval, Applicants offered to revise their design so that no portion of their new additions would encroach more than three feet from their northern boundary line. Their revised plan is depicted on Applicants' Exhibit 5.

15. Applicants also suggested that, should the Court insist as a condition conformance with the Regulations, their additions could be designed so as to respect a five-foot minimum setback from their northern boundary.

16. Applicants chose not to present at trial detailed design plans for their proposed additions, asserting that they did not wish to invest the resources to have detailed designs prepared until after they received word of whether they would be allowed to construct the desired improvements.

17. Applicants proposed at trial that their new additions would have an exterior finish similar to their existing residence: clapboards of a similar color, without any windows or other disruptions on the northern façade.

## II. **Neighborhood Surrounding Appellants' Property.**

18. The QCP District is a densely-settled residential area that adjoins a portion of Shelburne Bay area of Lake Champlain. Photos of some of the neighborhood homes were admitted at trial as Exhibit 8, which includes eighteen separate photos. These photos provide an accurate

---

[5] In re Berger & Katz Application, No. 119-7-10 Vtec (Vt. Super. Ct. Envtl. Div. Feb. 4, 2011) (Wright, J.).

4

representation of the proximity and relationship between adjoining homes and properties in this area.

19. All lots in the vicinity of Applicants' home are used for residential purposes. Most of the QCP District lots, including those surrounding Applicants' home, are quite small; one explanation provided at trial was that when the area was subdivided for development, the area was designed for small seasonal camp sites, given its proximity to Lake Champlain.

20. Today, many of the properties in Applicants' neighborhood have been improved and added onto so that the homes may be used throughout the year; most of these homes are now used as principal residences. Some of the permitted improvements to area homes have encroached significantly into side yard setbacks. Many neighborhood homes are less than ten feet apart, including homes that sit less than five feet from the common boundary line. Some of these homes do not have windows on the sides that face a closely adjoining home. Where there are windows on the sides of homes that are close to an adjoining home, the view from those windows is limited to that of the adjoining home; only indirect sunlight may reach such windows.

21. Applicants' and Neighbor's homes face west, as do most homes in their immediate vicinity. A frequently used park with swing sets and walking areas is across Central Avenue from their homes. The shores of the Shelburne Bay portion of Lake Champlain are southwest of this park.

22. Views of Shelburne Bay can be had from the front (western facing) windows of Applicants' home, Neighbor's home, and those homes in their immediate vicinity.

23. Because of the close proximity of the homes in this neighborhood to one another, few windows from the homes other than front (western facing) windows have unobstructed views of direct sunlight or any portion of Lake Champlain.

### III. Impact of Applicants' Proposed Improvements on Neighbors' Property.

24. Neighbor's property, which he uses as his family's principal residence, is immediately adjacent to Applicants' property. Their common boundary is to the south of Neighbor's home.

25. Neighbor takes great pride in his family's home, deservedly so. Neighbor has completed several improvements to his home and maintains it well.

26. A large maple tree on Neighbor's property, near the parties' common boundary line to the rear of Neighbor's home, provides shading and screening for both homes.

5

27.     Neighbor's property, like Applicants' property, has a small back yard that looks onto a wooded area that rises along a hillside to the east.

28.     Detailed photos of Neighbor's home, including its interior, were offered at trial, including Applicants' Exhibit 13 (containing 22 photos) and the City's Exhibit V, which includes photos labeled as Figures 1 through 6, inclusive.  These photos provide an accurate depiction of Neighbor's home, including the views that can be observed through his house windows and how those views are currently obstructed.

29.     Two experts credibly testified on the impact of Applicants' additions to views and sunlight enjoyed by Neighbor, especially from inside his home.  While each expert offered differing expert opinions on the magnitude of the impact from Applicants' additions, there was little material difference in their estimations of the additional impact to be caused by the proposed improvements.  Compare Applicants' Exhibits 19 & 20 with City's Exhibit T.

30.     Neighbor's home contains over thirty windows, only four of which face south.  Of those four south-facing windows, three have views that are partially or completely obstructed by Applicants' existing home.  These south-facing windows are depicted in the City's Exhibit V, at Figures 1 through 6, inclusive.[6]  The only south-facing window in Neighbor's home that has a view not currently obstructed by Applicants' home is a window in the rear of Neighbor's home, in his mud room area that serves as a rear entrance and exit area.  No credible evidence was provided that convinced the Court that Applicants' proposed improvements would obstruct the views from this south-facing mud room window.  Several of Applicants' proposed improvements will not interfere with Neighbor's views from inside his home.  For example, the two dormers Applicants propose to have installed on the southern portion of their roof will not impact any of Neighbor's views.  From the evidence presented, we also cannot discern how the new rear screened-in porch will impact on Neighbor's views, even if the existing rear deck were to remain unchanged.

31.     Neighbors will be able to view Applicants' proposed new front porch from their most westerly south-facing window, but the proposed porch will only cause minor additional

_____

[6] Some of the photos in Figures 1–6 depict multiple windows, some of which are not south-facing and are not obstructed by Applicants' home.  For example, see Exhibit V, Figure 3: the window to the right faces southwesterly and does not show any portion of Applicants' existing home or planned expansion areas; see also Figure 6: the window on the left faces easterly, towards Neighbor's rear yard; that view is mostly obscured by the maple tree in Neighbor's rear year, mentioned above in ¶ 26.  The view from that window also is not obstructed in any way by Applicants' existing home or their planned improvements.

obstruction of the total view from that window, particularly in light of Applicants' recent practice of stacking firewood on their existing front porch. The new interior space where Applicants' existing front porch now sits will be visible from the window in the center of the photo at Exhibit V, Figure 3, but not clearly visible from any other interior location.

32. Applicants' proposal for the rear deck is to replace it with a two-story addition to their residence; the addition will occupy the same footprint as the existing deck. In place of the existing deck and the eight-foot tall privacy wall that currently faces Neighbor's property, there will be a two-story wall (approximately sixteen to twenty feet tall), in the same footprint, and topped by a peaked roof that follows the same pitch as the existing peaked roof on Applicants' residence. Some of Neighbor's view will be blocked by this new exterior wall, but most likely only from one of his windows and from that window, only to a partial degree.

33. Neighbor's south-facing windows, even where obstructed by Applicants' existing home, receive indirect sunlight, as evidenced by the house plants that Neighbor maintains inside these obstructed windows. See Exhibit V, Figure 4. The additions Applicants propose to their home will not materially diminish Neighbor's access to this indirect sunlight from these already-obstructed south-facing windows.

### Conclusions of Law

These coordinated appeals represent the latest example presented to this Court of the unfortunate but frequently recurring incidents of disputes between neighbors who live within feet of one another in a densely settled area. While the City actively participated at trial and in the post-trial filing process, the City appears motivated not by any animus towards Applicants, but by a goal of assisting in the proper interpretation of the City of South Burlington Land Development Regulations ("Regulations"). The final resolution of these proceedings, whenever that does occur, is unlikely to resolve all disputes between Applicants and Neighbor. We do not have the authority to embark on that challenge; we limit our analysis to the conformance of Applicants' proposed development with the applicable provisions of the Regulations.[7]

---

[7] At the time of Applicants' 2010 application, the Regulations then in effect were those that had been adopted on May 12, 2003, with amendments effective January 11, 2010. The Regulations have since been amended further, with an effective date of March 15, 2011. None of the March 2011 amendments changed the provisions applicable to either of Applicants' applications, except in the labeling of a subsection of § 4.08: § 4.08(G) in the 2010 version of the Regulations is identical in language to § 4.08(F) in the 2011 version of the Regulations. Our references throughout this Decision are to the Regulations as amended on March 15, 2011. Copies of the relevant excerpts from the Regulations in effect in 2011 were

7

**I. <u>Non-Complying Structures and Expansions to Their Footprint and Square Footage.</u>**

We begin by analyzing the current development on Applicants' property and how that development may be characterized under the current Regulations. Applicants' property is a small lot of less than 5,000 square feet in size. Like many of their neighbors' properties in the QCP District, Applicants' property hosts a residential building that does not conform to the current dimensional requirements for that District. See Regulations Appendix C, Table C-2 (establishing a minimum side yard setback of five feet in the QCP District).

The fact that Applicants' existing building does not conform to the current setback requirements is not fatal to their current applications, since non-conforming structures may be maintained and even expanded, subject to certain conditions established in the Regulations. In particular, any non-conforming structure in the City "that is devoted to a conforming use may be reconstructed, structurally altered, restored or repaired, in whole or in part, with the provision that the degree of noncompliance shall not be increased." Regulations § 3.11(B)(3). The first condition expressed in § 3.11(B)(3) is that the pre-existing, non-conforming structure must be devoted to a permitted use. Applicants' present and planned future use of their property as their residence satisfies this condition, since residential uses are permitted in the QCP District. Regulations § 4.08(C) & Appendix C, Table C-1.

The established purpose of the QCP District provides helpful context for the analysis of the pending applications. The Regulations describe the purpose of the QCP District as "to encourage residential use at densities and setbacks that are compatible with the existing character of the Queen City Park neighborhood. It is designed to promote the area's historic development pattern of smaller lots and reduced setbacks. This district also encourages the conversion of seasonal homes to year round residences." Regulations § 4.08(A). Perhaps because of this somewhat unique purpose, the Regulations also establish specific criteria for permissible alterations of pre-existing, non-complying structures in the QCP District:

> **F. Non-complying Structures**. Structures in the Queen City Park District are not subject to all provisions of Article 3, Section 3.11, nonconforming uses and non-complying structures and lots. Non-complying structures shall be subject to the following requirements and restrictions:
>
> (1) Any non-complying building or structure may be altered provided such work does not:

admitted at trial as City Exhibit Q; copies of the relevant excerpts from the prior Regulations were admitted as City Exhibit R.

(a) Exceed in aggregate cost thirty-five percent (35%) for residential properties and twenty-five percent (25%) for nonresidential properties of the fair market value as determined by the City Assessor or by a separate independent appraisal approved by the Administrative Officer; or

(b) Involve an increase to the structure's height or footprint, or otherwise involve an increase to the square footage of the building or structure.

(2) The Development Review Board may approve any alteration which exceeds the thirty-five and twenty-five percent rule described above or which involves an increase to the structure's height, footprint or square footage subject to the provisions of Article 14, Conditional Use Review.

(3) In addition to the provisions set forth in sub-section G.2 above, the Development Review Board shall determine that the proposed alteration or expansion will not adversely affect:

(a) Views of adjoining and/or nearby properties;

(b) Access to sunlight of adjoining and/or nearby properties; and

(c) Adequate on-site parking.

Regulations § 4.08(F).

Thus, § 4.08 appears to supersede § 3.11 and place additional conditions upon alterations of non-complying structures that are located in the QCP District. See also Regulations § 3.11(D)(1) (providing that alterations to non-complying structures in the QCP District must also comply with Article 4, § 4.08). We therefore focus our initial analysis of the pending applications on § 4.08.

Applicants provided no specific cost estimates of their proposed improvements at trial. In post-trial filings, Applicants assert that the improvements will cost $105,000.00 and that their home is currently "assessed," presumably for real estate taxing purposes, at $323,000.00. Because no foundation or verification for these estimates of costs and value were presented at trial, Applicants failed to convince the Court that their planned improvements will have an aggregate cost of less than thirty-five percent of the current value of Applicants' property. See Regulations § 4.08(F)(1)(a). We need not render a final determination on whether Applicants satisfy the requirements of Regulations § 4.08(F)(1)(a), however, since an applicant must satisfy both subsections (a) and (b) to avoid the trigger for conditional use review found in Regulations § 4.08(F)(2). For the reasons noted below, we conclude that Applicants' proposed improvements do not comply with Regulations § 4.08(F)(1)(b) and must therefore satisfy both

9

the conditional use review standards and the additional standards imposed by Regulations § 4.08(F)(3).

Applicants represent that their proposed improvements will not exceed the height of their existing residence. We accept and adopt this representation, since we received no credible evidence contesting it. However, as noted in a previous pre-trial decision, Applicants' proposal to replace their rear deck with a two-story addition to their interior living space, as well as enclosure or replacement of their front porch so as to add to their interior living space, constitute increases in the square footage of Applicants' residence. In re Berger & Katz Application, No. 119-7-10 Vtec, slip op. at 6 (Vt. Super. Ct. Envtl. Div. Feb. 4, 2011) (Wright, J.).[8] We also noted that since Applicants intend to construct a new front porch and new rear screened-in deck, their plans also will cause an increase in their home's footprint. In re Berger & Katz Application, Nos. 119-7-10 Vtec & 141-9-11 Vtec, slip op. at 8–9 (Vt. Super. Ct. Envtl. Div. May 30, 2012) (Durkin, J.). There was no credible testimony or other evidence presented at trial to cause us to revisit and change these pre-trial legal determinations. We therefore conclude that Applicants' proposed improvements will cause both an increase in the footprint and square footage of their residence.

The consequence of this legal determination is that, as required by Regulations § 4.08(F)(2), Applicants' proposed improvements may only be allowed if the improvements conform to the conditional use standards of Article 14. Section 4.08(F)(3) imposes the additional requirements that the improvements "will not adversely affect: (a) Views of adjoining and/or nearby properties; (b) Access to sunlight of adjoining and/or nearby properties; and (c) Adequate on-site parking." For the reasons detailed below, we conclude that Applicants' proposed improvements, as conditioned below, conform to Regulations §§ 4.08(F)(2) and (3).

## II. Conformance to Article 14 Conditional Use Standards.

Article 14 of the Regulations establishes the criteria for conditional use approval. Specifically, to receive such approval, improvements to a pre-existing development must be both "consistent with the planned character of the area, as defined by the City of South Burlington Comprehensive Plan" and "conform to the stated purpose of the district" in which the use, or as in this case the proposed structural additions, are located. Regulations

---

[8] Judge Wright reviewed Applicants' first application and its conformance to the 2010 Regulations and therefore made reference to Regulations § 4.06(G)(2), which is codified in the 2011 Regulations at § 4.08(F)(2).

§§ 14.10(E)(1) & (2).  Applicants propose additions to their pre-existing residence, which is a permitted use in the QCP District and conforms to the stated purpose of the QCP District: "to encourage residential use at densities and setbacks that are compatible with the existing character of the Queen City Park neighborhood."   Regulations § 4.08(A).   This regulatory purpose is essentially a restatement of the intended development patterns expressed in the Comprehensive Plan's objectives and recommendations for this residential quadrant of the City. See City Exhibit P, which is a copy of the relevant portions of the City's Comprehensive Plan. For these reasons, we conclude that Applicants' proposed improvements to their pre-existing residential dwelling conform to Regulations §§ 14.10(E)(1) and (2).

Applicants' proposed additions must also satisfy the additional criteria for conditional use approval expressed in Regulations § 14.10(E)(3):

The proposed use shall not adversely affect:

(a) The capacity of existing or planned municipal or educational facilities.

(b) The planned character of the neighborhood or district in which the property is located, or the ability to develop adjacent property for appropriate uses.

(c) Traffic on roads and highways in the vicinity.

(d) Bylaws in effect.

(e) Utilization of renewable energy resources.

Applicants' proposed improvements will not change the use of their residence and will not cause or contribute to an expansion of that residential use.  While Applicants' proposed improvements will increase their home's footprint and square footage, no evidence was presented that these improvements will increase the bedrooms or bathrooms in Applicants' home.  Although the Regulations provide no basis for restricting the number of Applicants' family members that call this property home, we note that no evidence was presented that the number of family members occupying Applicants' home will increase.  We therefore conclude that Applicants' proposed improvements will not affect, adversely or otherwise, (a) the capacity of municipal or educational facilities or (c) area traffic.  As we noted above, Applicants' proposed improvements are aligned with the planned character of the neighborhood and the stated purposes of the QCP District, and we received no evidence that the proposed improvements will in any way impede the development on adjacent properties.  We therefore conclude that Applicants' proposed improvements conform to subsection (b).

11

We also received no evidence that the proposed improvements will materially increase Applicants' energy needs and therefore conclude that Applicants' plans need not incorporate the additional utilization of renewable energy resources. Lastly, we received no evidence that Applicants' proposed improvements will not conform to other regulatory provisions, save for the issue of side yard setback, which we address in the final section of this Decision. For these and the remaining reasons stated below, we conclude that Applicants' proposed improvements conform to subsections (d) and (e).

Having determined that Applicants' proposed improvements satisfy all of the conditional use criteria of Regulations § 14.10(E), we conclude that the improvements to this non-complying residential structure may be allowed, even though they will increase both the footprint and square footage of Applicants' residence. See Regulations § 4.08(F)(2). We therefore now turn to conformance with the final subsection of Regulations § 4.08(F): subsection (3).

### III. **Conformance to Additional Criteria Concerning Views, Sunlight & Parking.**

When a proposed expansion of a non-complying structure in the QCP District results in an increase of the structure's footprint or square footage, the applicant must also show that the proposed expansion plans "will not adversely affect: (a) Views of adjoining and/or nearby properties; (b) Access to sunlight of adjoining and/or nearby properties; and (c) Adequate on-site parking." Regulations § 4.08(F)(3). There was no evidence presented that Applicants' proposed improvements would render their on-site parking inadequate.[9] We therefore focus our analysis on the project's impacts on views and access to sunlight.

The parties spent much time at trial debating the impact of Applicants' proposed improvements upon Neighbor's views and access to sunlight, particularly from inside Neighbor's residence. No suggestion was made that the proposed improvements would have an impact upon the views or accesses to sunlight from outside Neighbor's home, in either his front or rear yards. In fact, when standing in front of his home, Neighbor will continue to enjoy a clear view of the adjacent playground and a somewhat obscured view of Shelburne Bay, which is to the southwest of his home. Similarly, Neighbor will continue to be able to enjoy his rear yard, which while shaded by his maple tree, enjoys some direct sunlight during some

---

[9] Applicants do not propose any changes to their driveway, the parking area on the driveway, or their pre-existing garage.

12

portions of the day. The proposed improvements will not materially diminish Neighbor's views or access to sunlight while he is outside his home in his front or rear yard.

Next, we note that no evidence was presented that either the proposed dormers or the rear screened deck would interfere with Neighbor's views or access to sunlight. In fact, the DRB concluded that Applicant needed no permit or approval for the dormer additions. Because the dormers constitute improvements to a pre-existing, non-complying structure and are proposed in connection with a combination of improvements that collectively will increase Applicants' home footprint and square footage, we include the dormers in our analysis here. However, since we conclude that neither the dormers nor rear screened deck will cause added obstruction to Neighbor's views or access to sunlight, we conclude that the dormers and rear deck will conform to Regulations § 4.08(F)(3).

The remaining question is whether the other proposed improvements will cause an adverse effect on Neighbor's views and access to sunlight. Adverse effect is a term of art often used in municipal land use regulation. Thankfully, our Supreme Court has provided guidance on the proper analysis this term of art requires, concluding that "the adverse effect test [in municipal conditional use criteria] must be applied reasonably to prohibit only substantial and material adverse effects." In re Miller, 170 Vt. 64, 69 (1999) (citing In re Walker, 156 Vt. 639, 639 (1991) (mem.)) (emphasis added). Given that some of Applicants' improvements will be seen from at least two windows within Neighbor's home, it is beyond dispute that Applicants' improvements will have an impact on Neighbor's views. But we cannot agree that those impacts will be substantial or material and therefore conclude that Applicants' proposed improvements will not "adversely affect" Neighbor's views or access to sunlight, as that term is used in Regulations § 4.08(F)(3) or as interpreted by our Supreme Court.

In particular, we note that the credible evidence showed that even the most substantial portions of Applicants' improvements will not be able to be viewed from inside Neighbor's home from the vast majority of windows. Neighbor appeared to conflate the impact Applicants' existing home has on his interior views, which is substantial, with the impact from the additional improvements Applicants propose, which is relatively minimal. When we focus our analysis on just the proposed improvements, which are the only portions of Applicants' home that are subject to our review in these proceedings, we do not regard the added impact upon either Neighbor's views or access to sunlight to be material or substantial.

13

The parties provided credible testimony from experts on the improvements' impact on the sunlight reaching Neighbor's home. While these experts offered differing opinion testimony on the materiality of the impact, their evidence appeared to consistently show that the improvements will only have a minimal and short-lived impact upon shading and sunlight. Compare Applicants' Exhibits 19 & 20 with City's Exhibit T. Of additional import is that Neighbor continues to enjoy and maintain a large maple tree in his back yard that obscures much of the sunlight reaching the rear of his home in the spring, summer, and fall. This tree is so well developed that even in the winter, its branches obscure most of the direct sunlight to the rear of Neighbor's home.

For all these reasons, we conclude that Applicants' proposed improvements will not adversely affect Neighbor's views or access to sunlight, particularly when compared to his present views and sunlight access. We therefore conclude that Applicants' proposed improvements conform to Regulations § 4.08(F)(3).

## IV. Setback Encroachments.

Our remaining challenge is to determine which setback requirement Applicants' improvements must meet. First, in considering an expansion to a pre-existing, nonconforming structure, we note that our Supreme Court has stated that the "ultimate goal" of municipal zoning regulation "is to gradually eliminate nonconforming uses" and because of that goal, "any expansion of that use [must be] carefully limited." In re Smith, 2006 VT 33, ¶ 10, 179 Vt. 636 (mem.). The Supreme Court has explained this important goal and purpose of zoning by noting that "the public interest in the regulation and gradual elimination of nonconforming uses is strong." In re Gregoire, 170 Vt. 556, 559 (1999) (citing Hinsdale v. Village of Essex Junction, 153 Vt. 618, 626 (1990)). With this goal in mind, we consider whether Applicants' proposed improvements would constitute an impermissible expansion of a non-conforming use or structure.

The parties agree that the applicable provisions of the Regulations generally call for a five-foot minimum setback from side boundary lines in the QCP District, pursuant to Regulations Appendix C, Table C-2. An applicant may be entitled to a reduction of the side yard setback to a minimum of three feet, pursuant to Regulations § 3.06(J)(3).[10] The parties

---

[10] The § 3.06(J) setback exception is available for lots or dwelling units "in existence prior to February 28, 1974," so long as "the existing or proposed principal use on the lot is a single-family dwelling or a two-

disagree on whether the facts presented allow Applicants to qualify for a side yard setback reduction.

Applicants' existing home is entirely within this established setback, by one foot at its northwestern corner and by over two feet at its northeastern corner. Applicants' plan to enclose or replace their front porch and rear deck with new interior structures that would add to their square footage would therefore constitute an expansion of their home's nonconformity, which would be in direct conflict with the Smith and Gregoire precedents, as well as the express restrictions contained in Regulations § 3.11(B)(3) (limiting expansions of non-complying structures to those that do not increase "the degree of noncompliance").

Applicants have repeatedly asserted that constructing their proposed improvements in the same footprint as their existing front porch and rear deck would not increase the degree of their home's non-conformance, but they are mistaken in this regard, as this Court has previously explained. See In re Berger & Katz Application, Nos. 119-7-10 Vtec, slip op. at 6 (Vt. Super. Ct. Envtl. Feb. 4, 2011) (Wright, J.). Applicants' proposal to replace their rear deck with a two-story addition to their interior living space, as well as enclosure or replacement of their front porch so as to add to their interior living space, would increase the square footage of Applicants' residence. Id. We received no evidence at trial to contradict the factual foundation for this prior ruling. We therefore conclude that Applicants' proposed enclosure or replacement of their front porch and rear deck would generally result in an impermissible expansion of the pre-existing non-conformity of their home.

There is one possible saving mechanism available to Applicants. The Regulations, perhaps in accordance with the purposes expressed for the QCP District of maintaining homes on small lots with reduced setbacks, allow for a further reduction in the side yard setback to no less than three feet. See Regulations § 3.06(J)(3). To be allowed to reduce the side yard setback minimum to three feet, an applicant must show that his or her project "will not have an undue adverse affect [sic] on: (a) views of adjoining and/or nearby properties; (b) access to sunlight of adjoining and/or nearby properties; (c) adequate on-site parking; and (d) safety of adjoining and/or nearby property." Id. We have previously concluded, in our analysis above on the project's conformance with Regulations § 4.08(F)(3), that the proposed improvements will not

family dwelling." Applicants' lot and both their existing and proposed uses of their property meet these requirements.

cause an adverse impact upon criteria identical to those in Regulations §§ 3.06(J)(3)(a), (b), and (c). We further note that there was no evidence provided at trial that Applicants' proposed improvements will raise safety concerns at any adjoining or nearby property. See Regulations § 3.06(J)(3)(d). We therefore conclude that Applicants' proposed improvements conform to Regulations § 3.06(J)(3) and are entitled to be located as close as three feet from the northern side yard boundary, but no closer.

There was some conflicting testimony at trial about the exact location of the common boundary between Applicants' and Neighbor's property. Applicants presented a surveyed plat of their property, although they did not present a plat that specifically depicted the dimensions of their improvements or all the distances of their improvements from the nearest boundary lines. Of those boundary line distances provided, some appear to have been added to the survey after the fact and not by the surveyor who prepared the plat. Rather than rely upon this deficiency to deny Applicants the approval they seek, we will condition the issuance of a zoning permit for their improvements upon their filing of a proper and complete survey plat.

### Conclusion

For the reasons detailed above, we **GRANT** approval to Applicants for their improvements as proposed, subject to the following conditions:

1. Prior to the issuance of any zoning permit for the identified improvements, and prior to commencing any construction of such improvements, Applicants shall file with the City of South Burlington Planning Office a revised survey from a licensed land surveyor that accurately depicts their northern boundary and all improvements authorized by this Merits Decision, showing the specific dimensions of each improvement and their distance from the nearest boundary line.

2. Applicants shall also provide the City of South Burlington Planning Office with a description of the materials and colors for the exterior of each improvement.

3. In the event that Applicants fail to provide the survey and information necessary to completely satisfy conditions 1 and 2 within one year of the date this Merits Decision and Judgment Order become final (i.e., thirty days from the date hereof or from whenever any appeal shall become final), then the approvals contained in this Merits Decision and Judgment Order shall become null and void and Applicants shall be required to re-apply for approval of any improvements they seek to complete.

These proceedings are remanded to the City of South Burlington Planning Office for the sole purpose of completing the ministerial act of receiving the completed survey and exterior

16

siding information required in conditions 1 and 2, above, and to thereafter issue Applicants a zoning permit for the approved improvements.

This completes the current proceedings before this Court in these Dockets. A Judgment Order accompanies this Merits Decision.

Done at Berlin, Vermont this 7th day of March, 2013.

_____

Thomas S. Durkin, Environmental Judge